NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| L.Y., ET AL.<br><br>                  Plaintiff,<br><br>   v.<br><br>BAYONNE BOARD OF EDUCATION, ET AL.<br><br>                  Defendant. | Civil Action No. 10-5698 (CCC)(JAD)<br><br>OPINION |

**CECCHI**, District Judge.

This matter comes before the Court by way of the motion for summary judgment filed by Defendant Bayonne Board of Education ("Defendant" or "Bayonne"). Plaintiffs L.Y., individually and o/b/o J.Y., and Elysian Charter School of Hoboken ("Elysian" and collectively with L.Y., "Plaintiffs") opposed Bayonne's motion and filed a cross-motion for summary judgment. The Court has jurisdiction over this matter pursuant to 20 U.S.C. § 1415. This matter is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Bayonne's motion for summary judgment is granted and Plaintiffs' motion for summary judgment is denied.[1]

**I. INTRODUCTION**

---

[1] The Court considers any arguments not presented by the parties to be waived. See Brenner v. Local 514, United Bhd. of Carpenters & Joiners, 927 F.2d 1283, 1298 (3d Cir. 1991) ("It is well established that failure to raise an issue in the district court constitutes a waiver of the argument.").

This case arises under the Individuals with Disabilities Education Act ("IDEA"), 42 U.S.C. § 1400 et seq. and involves a dispute over the 2009-2010 Individualized Education Program ("IEP") developed for J.Y., the son of Plaintiff L.Y. It differs, however, from the traditional IEP dispute under the IDEA in that it involves three interested parties: the student (and his parent), the charter school he attended and that was involved in creating the challenged IEP, and the resident school district which bears financial responsibility for implementation of the IEP. In addition to administrative proceedings, this matter has been the subject of an application for a preliminary injunction, an appeal to the Third Circuit, and a motion to dismiss. Presently before the Court are competing motions for summary judgment arising out of Plaintiffs' appeal of the decision of Administrative Law Judge Ellen S. Bass.

## II. BACKGROUND

### A. *The IDEA*

Through the IDEA, 20 U.S.C. §1400, et seq., the federal government provides funding to assist states in educating children with disabilities living within their borders. 20 U.S.C. § 1412(a)(1)(A). Bd. of Educ. v. Rowley, 458 U.S. 176, 188–189 (1982). The IDEA requires that a state receiving federal education funding provide a "free appropriate public education" ("FAPE") to disabled children. 20 U.S.C. §1412(a)(1). To provide a FAPE, the IDEA instructs school districts to develop a detailed, individualized instructional plan – an IEP – for every disabled child. 20 U.S.C. § 1412(a)(4). The IEP consists of "a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." Holmes v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 589–90 (3d Cir. 2000) (citing 20 U.S.C. § 1401(a)(20)). An IEP is

2

created by a "team consisting of the student's parents and teachers, a curriculum specialist from the local school district and, if requested, a person with special knowledge or expertise regarding the student." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010) (citations omitted). An IEP team is required to meet annually to examine a child's progress and evolving needs. 20 U.S.C. § 1414(d)(4).

In defining the contours of FAPE, the Supreme Court has explained that the disabled child is entitled to "such services as are necessary to permit the child 'to benefit' from the instruction." Rowley, 458 U.S. at 188–189. Thus, the IEP must provide a "'basic floor of opportunity,' but not necessarily 'the optimal level of services.'" Bayonne Bd. of Educ., 602 F.3d at 557 (quoting Holmes, 205 F.3d at 590). However, "although the state is not required to 'maximize the potential of handicapped children,' . . . a satisfactory IEP must provide 'significant learning' and confer 'meaningful benefit.'" T.R. v. Kingwood Twp. Bd. Of Educ., 205 F.3d 572, 577 (3d Cir. 2000).

In addition, the IDEA requires that students who fall under its auspices are to be educated in the "least restrictive environment" available. 20 U.S.C. § 1412(a)(5)(A). Where possible, this requirement leads to "mainstreaming" disabled students by educating them alongside nondisabled students. Defined further, "[t]he least restrictive environment is one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled." Carlisle Area Sch. v. Scott P. *ex rel* Bess P., 62 F.3d 520, 535 (3d Cir. 1995).

The burden of establishing the inadequacy of a proposed IEP rests on the challenging party, typically the parents of the disabled child. Schaffer v. Weast, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 391 (3d Cir. 2006).

Under the New Jersey Charter School Act, when a child attends a charter school, as in this case, it is the charter school that is responsible for providing special education services to that student, including working with a child's parents to develop an IEP. N.J.S.A. 18A:36A-11(b). The school district where the child resides, however, bears fiscal responsibility for a child's special education services where the IEP developed by the charter school and the child's parents requires placement at a private day or residential school. Id. For that reason, the statute provides that:

> Within 15 days of the signing of an individualized education plan, a charter school shall provide notice to the resident district of any individualized education plan which results in a private day or residential placement. The resident district may challenge the placement within 30 days in accordance with the procedures established by law.

Id.

### B. *J.Y.'s 2009-2010 IEP*

J.Y. is student who resides in the City of Bayonne.[2] J.Y. was born in Romania on November 1, 1995 into an impoverished family. (Cmp. ¶ 9.) He was adopted by L.Y. and her husband in December 1996. (Id.) Although a resident of Bayonne, J.Y. attended Elysian, a charter school selected by his parents, from September 2002, when he was in the first grade, through June 2010. At Elysian, the atmosphere is "informal, classes are small, and students address their teachers by their first names." (ALJ Opinion 4.) Elysian is a "mainstream-instructional setting," but it integrates students with learning disabilities. (Id.) Upon his enrollment in 2002, Elysian identified J.Y. as a student in need of special education services. At

---

[2] As of the date the Complaint was filed, J.Y. was 15 years old.

that time, Elysian performed an evaluation of J.Y. and classified him as having learning disabilities requiring special instruction. Beginning in 2002, Elysian formulated IEPs for J.Y. that involved special education services provided at the school. The IEP team at Elysian developed an IEP for J.Y. each year thereafter.

Despite receiving special instruction while at Elysian, J.Y.'s academic and social functioning levels fell far below that of his peers. (Cmp. ¶¶ 12-13.) In April 2009, during J.Y.'s sixth-grade year, his IEP team at Elysian advised L.Y. that they could not meet J.Y.'s needs and that it was appropriate to explore other educational opportunities for him outside of Elysian. (ALJ Op. 4; Cmp. ¶ 15.) Thereafter, Elysian developed an IEP for J.Y. that called for his placement at the Community School, a private day school for the educationally-disabled located outside of the Bayonne School District, for the 2009-2010 school year. On June 9, 2009, L.Y. approved the 2009-2010 IEP. (ALJ Op. 10.)

### C. *Bayonne's Due Process Challenge*

Bayonne was not involved in the creation of J.Y.'s June 9, 2009 IEP. Rather, as required by New Jersey law, Elysian notified Bayonne of its intent to place J.Y. in a private day school for the 2009-2010 school year. On July 28, 2009, Bayonne then exercised its statutory right under New Jersey's Charter School Program Act to contest J.Y.'s placement and initiated a due process hearing with the Department of Education. Bayonne claimed that an in-district school placement for J.Y. would provide him with a FAPE in the least restrictive environment among non-disabled children, as required by the IDEA. Bayonne sought entry of an order compelling J.Y. to be educated in an in-district program in Bayonne rather than at the Community School.

5

Plaintiffs filed an emergent application and cross-petition seeking to invoke the "stay put" provisions of the IDEA and place J.Y. at the Community School during the pendency of the administrative proceedings. Plaintiffs' application was denied by an Administrative Law Judge. Plaintiffs then filed a complaint in this Court, appealing the Administrative Law Judge's determination and requesting an injunction requiring J.Y. to be placed at the Community School at Bayonne's expense. On September 15, 2009, the Hon. Stanley R. Chesler denied Plaintiffs' request for an injunction and determined that J.Y. should remain at Elysian during the pendency of the dispute. Plaintiffs filed an appeal and the Third Circuit subsequently affirmed Judge Chesler's decision on June 10, 2010.

While Plaintiffs' appeal in the Third Circuit was pending, Bayonne's due process hearing proceeded before Administrative Law Judge Joseph Paone. During the hearing, Judge Paone directed Bayonne to propose a new IEP for J.Y. After Bayonne prepared the IEP, the hearing continued before Administrative Law Judge Ellen S. Bass (the "ALJ").

### D. *The ALJ's Decision*

On August 26, 2010, the ALJ granted Bayonne's petition, finding that Bayonne could offer J.Y. a FAPE under the IDEA in its in-district program. The ALJ made significant factual findings, many of which were based on the credibility of witnesses.[3] The ALJ also carefully and thoroughly considered Bayonne's recommendations for L.Y., which included "a self-contained class where he could receive instruction at his functional level, together with mainstreaming for 'specials' and lunch." (ALJ Op. 13.) In addition, the program offered by Bayonne addressed

---

[3] For example, the ALJ specifically found, based on L.Y.'s testimony, "that she was entirely closed-minded to a placement in Bayonne." (ALJ Op. 9.)

6

"J.Y.'s social and emotional needs by offering him counseling and speech and language therapy designed to improve his pragmatic language, a skill needed to allow him to engage in successful social interactions." (Id. 20.) The ALJ further held that although the Community School was appropriate to meet J.Y.'s educational needs, it would be a "more restrictive environment than that offered in Bayonne." (Id. 17.) The ALJ thus granted Bayonne's petition and ordered it to make available to J.Y. an appropriate in-district educational program.

### E. Judge Chesler's Decision

On November 2, 2010, Plaintiffs instituted this matter to appeal the ALJ's decision. Plaintiffs' initial Complaint named as defendants the New Jersey Department of Education and its interim Commissioner (the "State Defendants"). Plaintiffs claimed that the State Defendants violated provisions of the IDEA by asserting their right under N.J.S.A. 18A:36-11(b) to challenge J.Y.'s IEP. Plaintiffs argued that N.J.S.A. 18A:36-11(b) conflicted with the IDEA and violated the Supremacy Clause of the United States Constitution by allowing a district of residence, a non-IEP member, to unilaterally prevent implementation of an IEP. The State Defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). On March 29, 2011, Judge Chesler granted the State Defendants' motion, finding that N.J.S.A. 18A:36-11(b) does not conflict with the IDEA and is constitutional. Accordingly, Judge Chesler dismissed Plaintiffs' claims against the State Defendants and determined that Plaintiffs' only remaining cause of action was an IDEA claim, vis-à-vis Bayonne, based upon the administrative record.

## III.  LEGAL STANDARD

In reviewing an administrative determination in an IDEA case, "the district court applies a modified *de novo* review and is required to give due weight to the factual findings of the ALJ." L.E. v. Ramsey Bd. of Ed., 435 F.3d 384, 389 (3d Cir. 2006).  While "the District Court must make its own findings by a preponderance of the evidence," the court "must also afford 'due weight' to the Administrative Law Judge's determination."  Shore Reg'l High School Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (citing 20 U.S.C. § 1415(i)(2)(B)(iii)).  "Factual findings from the administrative proceedings are to be considered *prima facie* correct," and where the Administrative Law Judge has heard live testimony and made determinations of credibility, "that determination is due special weight."  Id.  Further, the burden is on the party challenging the administrative law decision to prove by a preponderance of the evidence that the decision was erroneous.  Schreiber v. Ridgewood Board of Education, 952 F. Supp. 205, 210 (D.N.J. 1997).

"Because the IDEA requires a district court to grant a judgment on the record based on its own ascertainment of the preponderance of the evidence, many IDEA claims do not fit into the typical summary judgment standard of 'no genuine issues of material fact.'"  D.F. v. Collingswood Pub. Sch., 804 F. Supp. 2d 250, 254 (D.N.J. 2011) (quotations omitted).  The parties in an IDEA case are effectively seeking "a judgment on the administrative agency's record."  Id.

## IV.  DISCUSSION

### A. The IDEA's Procedural Safeguards

　　　1. Bayonne's Challenge to J.Y.'s IEP

As explained above, J.Y.'s parents enrolled him at Elysian when he was in the first grade. Upon his enrollment in 2002, he was identified as a student in need of special education services and provided with a yearly IEP. Despite receiving specialized instruction, J.Y. began to experience serious social and academic issues. In particular, he was years behind his age group in reading. As a result, during his sixth-grade year, his IEP team at Elysian advised his mother that they could not meet his needs and placement at the Community School would be a better fit for him.

Bayonne was not involved in the creation of this IEP, but was notified by Elysian of its intent to place J.Y. in a private day school. Bayonne exercised its statutory right to contest J.Y.'s placement and initiated a due process hearing with the Department of Education. Plaintiffs then filed an emergent application seeking to place J.Y. at the Community School during the pendency of the administrative proceedings. Plaintiffs' application was first denied by an Administrative Law Judge and later by Judge Chesler. Plaintiffs filed an appeal and the Third Circuit subsequently affirmed Judge Chesler's decision. While the appeal was pending, the ALJ determined that Bayonne could offer J.Y. a FAPE in its in-district program. Plaintiffs then instituted this matter to appeal the ALJ's decision.

Importantly, N.J.S.A. 18A:36A-11(b) provides that:

> Within 15 days of the signing of an individualized education plan, a charter school shall provide notice to the resident district of any individualized education plan which results in a private day or residential placement. The resident district may challenge the placement within 30 days in accordance with the procedures established by law.

9

N.J.A.C. 6A:23A-15.4 further provides that "the due process hearing shall be limited in scope to a determination by an administrative law judge as to whether there is a less restrictive placement that will meet the student's educational needs , and if so, whether the charter school must place the student in such a program."

Bayonne complied with N.J.S.A. 18A:36A-11(b) and effectuated a timely challenge of Elysian's suggested placement at the Community School. The question before the ALJ was whether Bayonne would offer J.Y. a FAPE in a less restrictive environment than the one proposed by Elysian and L.Y. The ALJ determined that it would.

In addition, the ALJ (as Judge Chesler did subsequently) rejected Plaintiffs' argument that Bayonne violated J.Y.'s procedural rights by initiating its due process proceeding. (See ALJ Op. 23) ("The contention by [Plaintiffs] that Bayonne violated the IDEA by preventing J.Y.'s placement at Community and by not agreeing to Community as the "stay put" placement is without merit. . . Nor did Bayonne violate the provisions of the IDEA by asserting its rights under N.J.S.A. 18A:36A-11(b)."). In fact, the ALJ explained that "Bayonne ha[d] no obligation to offer an IEP to J.Y., unless and until he [was] enrolled in the Bayonne schools." (Id. 24.) As such, the ALJ found that Bayonne was not required to involve L.Y. before exercising its statutory right to challenge J.Y.'s recommended placement at the Community School.

This Court also finds that, as evidenced by the record and the lengthy history of this case, Bayonne followed the appropriate procedures in initiating its due process petition. That Bayonne was required to do anything other than filing its due process petition is without support in any statute, regulation or case law.

2. <u>Bayonne's Alleged Mistakes</u>

Plaintiffs dedicate a substantial portion of their opposition to the argument that Bayonne was required to confer with L.Y. and J.Y.'s IEP team prior to filing its due process objection. (Pl. Opp. 6-14; Pl. Mot. 28-41.) Similarly, Plaintiffs present a laundry list of items that "Bayonne could have [done] differently" prior to its due process challenge. (<u>Id.</u>) Based on these arguments, Plaintiffs allege that "Bayonne unquestionably sought to change . . . J.Y.'s rights by affording L.Y. none of the procedural safeguards to which she was entitled." (Pl. Opp. 5.)

Judge Chesler held that Bayonne's objection to J.Y.'s IEP under N.J.S.A. 18A:36-11(b) did *not* involve procedural violations of the IDEA. With regard to Plaintiffs' "change in educational placement" argument in particular, Judge Chesler held that "N.J.S.A. 18A:36-11(b) does not conflict with the IDEA's 'prior notice' or 'detailed description' requirements since it does not permit a district of residence to challenge the *type* of special education decided-upon by the IEP team." (Mar. 29, 2011 Op. 12.) Plaintiffs do not highlight any language in the IDEA or elsewhere to the contrary.

Further, although Plaintiffs criticize the ALJ for her finding that L.Y. was disinclined to work with Bayonne, the ALJ's analysis focused not only on the conduct of Plaintiffs but of Bayonne as well. (<u>See</u> ALJ Op. 23) (finding that "there is blame to go all around"). The ALJ admonished Bayonne for its failure to meet with J.Y. or confer with Elysian about his education until *after* it realized its financial responsibility for J.Y.'s education at the Community School. In addition, the ALJ pointed out Bayonne's obligation to immediately request a copy of J.Y.'s records to determine whether a less-restrictive program would meet his needs. (<u>Id.</u> 24.) In fact, it was based on Bayonne's obligation to "put forth a better effort to convince [L.Y.] that it had

11

something valuable to offer her son" in June 2009 that the ALJ ordered Bayonne to provide J.Y. with a compensatory education for the year. (Id. 25-26.)[4]

More important, however, is the fact that Plaintiffs' claims regarding the actions – or inactions – of Bayonne, and any supposed procedural violations that stem therefrom, do not affect Bayonne's ability to now provide J.Y. with a FAPE in the least restrictive environment. As further explained below, this Court agrees with the ALJ that Bayonne can provide a FAPE to J.Y. in its in-district program.

### B. Bayonne's In-District Program

Based on the preponderance of the evidence contained in the complete record, the ALJ was correct in determining that Bayonne can appropriately meet J.Y.'s needs in a less restrictive environment than that proposed by the Elysian Team IEP. In Oberti v. Bd. of Educ., 995 F.2d 1204, 1207 (3d Cir. 1993), the Third Circuit construed the "IDEA's mainstreaming requirement to *prohibit* a school from placing a child with disabilities outside of a regular classroom if educating the child in the regular classroom, with supplementary aids and support services, can be achieved satisfactorily. In addition, if placement outside of a regular classroom is necessary for the child to receive educational benefit, the school may still be violating the IDEA if it has

---

[4] The ALJ also determined, in terms of compensatory education, that Bayonne should provide "two hours a week of extra support after school for the first semester, and that this support should include academic assistance and/or counseling." (ALJ Op. 26.) The ALJ further explained that the grant of compensatory education was "intended to smooth J.Y.'s transition to his new school setting" and therefore was "conditioned on his attendance in the Bayonne district in September 2010." (Id. 26.) Plaintiffs now argue that the ALJ's award of compensatory education should be "expanded," yet offer no suggestion or compelling justification in support. In addition, it is undisputed that J.Y. did not enroll in the Bayonne school district in September 2010 – the ALJ's prerequisite for the grant of compensatory education. Thus, the Court will not disturb the ALJ' well-reasoned findings on compensatory education.

12

not made sufficient efforts to include the child in school programs with nondisabled children whenever possible." (emphasis added). In fact, "[i]f the school has given no serious consideration to including the child in a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's mainstreaming directive." Id. at 1216.

After several days of hearings and a thoughtful consideration of the record, the ALJ determined that Bayonne could offer J.Y. a FAPE in a less restrictive environment than that of the Community School. As stated above, the ALJ based the majority of her findings on the credibility of witness testimony, which this Court must accept unless the non-testimonial, "extrinsic evidence in the record would justify a contrary conclusion." Bayonne Bd. of Educ., 602 F.3d at 564 (3d Cir. 2010). The witnesses testified that the school district services approximately 9,000 students, 1,300 of whom are classified. (ALJ Op. 10.)[5] In Bayonne, J.Y. would attend self-contained academic classes, "but then join the mainstream for lunch, physical education and 'specials' such as art, music or computer instruction." (Id. 11.) The witnesses testified that being integrated into the school community would benefit J.Y. "socially, emotionally and educationally." (Id.) In addition, Bayonne "would offer J.Y. programming in life skills and transition skills," as well as the ability to "participate in a full range of extracurricular activities." (Id. 14.) Thus, Bayonne's offered program meets the FAPE *and* mainstreaming requirements of the IDEA. See Oberti, 995 F.2d at 1217 fn 24 ("Courts should

---

[5] Although some students requiring special education services cannot be accommodated, "such students are behaviorally involved or have complex medical issues that make it impossible to serve their needs within the district." (Id. 10-11.)

13

also consider the reciprocal benefits of inclusion to the nondisabled students in the class. Teaching nondisabled children to work and communicate with children with disabilities may do much to eliminate the stigma, mistrust and hostility that have traditionally been harbored against persons with disabilities.").

Plaintiffs' main substantive arguments regarding Bayonne's proffered program center on the Read 180 program and J.Y.'s classification as an eighth grader. (Pl. Opp. 14-17; Pl. Mot. 44-48.) The Read 180 program was especially important to the ALJ, considering that "J.Y.'s greatest deficits were in reading." (Id. 13.) The Bayonne teachers testified about the program in detail, explaining that "it uses a variety of methodologies so that it reaches a broad spectrum of students." (Id. 13-14.) One of the teachers "spoke passionately of the progress her students have experienced, at one point moved to tears in describing the joy of seeing a student finally learn to read." (Id. 14.) Although the ALJ considered Plaintiffs' objections to the program, she concluded that their testimony "was of little credibility, as these witnesses had not observed the program proposed . . . or even met or discussed the programming possibilities at Bayonne . . . in any kind of serious way." (Id. 14.) In terms of J.Y.'s grade placement, the ALJ concluded that although eighth grade would be an appropriate placement for J.Y., Bayonne "just as surely would have acceded to his mother's strong wish that he remain in the seventh grade." (Id. 15.) In any event, the Court finds this argument to be moot because J.Y. is currently in high school.

Finally, the ALJ provided an in-depth analysis of the Community School Program. The director of the Community School herself clarified that "it was not her intent to suggest that her program was the only place where J.Y. would experience success." (Id. 17.) Although the ALJ found that the Community School would be appropriate to meet J.Y.'s educational needs, she

14

also found it to be a more restrictive environment than that offered in Bayonne. (Id.) Based on a modified *de novo* review of the record, the Court agrees.

In sum, the Court affirms the ALJ's holding that Bayonne can offer J.Y. a FAPE in the least restrictive environment. Plaintiffs have not provided any evidence that J.Y. will not be successfully integrated into the Bayonne public school, or that Bayonne will not be sincere in its attempt to provide J.Y. with an appropriate IEP. More importantly, the Court is convinced that mainstreaming J.Y. – in accordance with the letter and intent of the IDEA – will provide him with the most beneficial setting for the development of his educational, social and life skills.

### C. A District's Participation in the IEP Process

Finally, Plaintiffs make an additional argument that Judge Chesler's decision rendered Bayonne's actions in presenting its offering of a FAPE as violative.

Judge Chesler held that a district may not, through a due process objection, challenge the fact that a student is disabled. However, Judge Chesler did acknowledge that a district of residence retains the right to "demonstrate that it can provide the educational placement that was determined by the IEP team, in-district." (Mar. 29, 2011 Op. 11.) Moreover, Judge Chesler found that the statutory framework "does offer the resident district an opportunity to challenge the IEP agreed-to by the charter school and the parents." (Id. 5.) Bayonne properly acted in accordance with the law.

A district of residence that can provide a student with a FAPE in a more mainstreamed environment has the *obligation* to propose that option. The inability of a district to challenge an IEP based on such a proposal would actually violate the IDEA, which requires special education services to be provided in the least restrictive environment. (See Mar. 29, 2011 Op. 10) ("This

15

provision of the IDEA sets forth a strong congressional preference for integrating children with disabilities in regular classrooms and creates a presumption in favor of mainstreaming. The N.J.S.A. 18A:36-11(b), in permitting challenges to the restrictiveness of a program's placement, furthers compliance with the IDEA by ensuring that students with disabilities are placed in the least restrictive environment.") As such, the Court finds Plaintiffs' argument to be without merit.

## V.  CONCLUSION

The Court grants Bayonne's motion for summary judgment and denies Plaintiffs' cross motion for summary judgment. The Court also denies Plaintiffs' request for attorney fees. An appropriate Order accompanies this Opinion.

CLAIRE C. CECCHI, U.S.D.J.

Dated: December 20, 2012